**United States District Court**
For the Northern District of California

1

2

3

4

5                          UNITED STATES DISTRICT COURT

6                          NORTHERN DISTRICT OF CALIFORNIA

7

8    DARLING INTERNATIONAL, INC.,               No. C-05-3758 EMC

9              Plaintiff,

10         v.                                   **FINDINGS OF FACT AND
                                                CONCLUSIONS OF LAW**
11   BAYWOOD PARTNERS, INC., *et al.*,

12             Defendants.

13
     _____/
14

15         A bench trial was held in this case commencing on May 7, 2007, and ending on May 15,

16   2007.  The Court heard live testimony and testimony by deposition and admitted documentary

17   evidence.  The Court, having considered all the evidence and the post-trial submissions of counsel,

18   makes the following findings of fact and conclusions of law.

19                          I.    **FINDINGS OF FACT**

20   A.        Parties and Property at Issue

21         Plaintiff and Counterdefendant Darling International, Inc. ("Darling") is a Delaware

22   corporation, formerly known as Darling-Delaware Co., Inc.

23         Defendant and Counterclaimant Baywood Partners, Inc. ("Baywood") is a California

24   corporation.

25         Darling is the owner of certain real property in Petaluma, California ("Property" or "Darling

26   Property"), consisting of approximately 19 acres and designated as Assessors Parcels Nos. 005-060-

27   41-3 and 005-060-42-1.  *See* Ex. B26 (Agreement).  The Property is landlocked, *see* Tr. at 392

28   (testimony of Mr. Whiting), and is subject to claims by the State of California resulting from its

United States District Court
For the Northern District of California

ownership of and jurisdiction over tidelands and public trust property.  As of 1990, the Property was contaminated with hazardous materials.  *See* Ex. B28 (General Report).

Baywood's primary purpose when formed was the acquisition and development of the Darling Property.  *See* Tr. at 118 (testimony of Mr. Wasem).

The officers and board members of Darling changed frequently during the relevant time period.  However, during the relevant time period, there were two corporate officers with primary responsibility over the Property: Brad Phillips and Bill McMurtry.

Brad Phillips started his employment with Darling in late 1988.  *See* Phillips Depo., vol. I, at 11.  Since 1993, he has, in essence, been responsible for overseeing Darling's real estate holdings.  *See id.* at 14-15.  Mr. Phillips first became involved with the Property in 1993.  *See id.* at 17.  In 1994, Mr. Phillips became treasurer of Darling.  *See id.* at 12.

Bill McMurtry started his employment with Darling in late 1996.  *See* McMurtry Depo., vol. I, at 12.  He was hired and continues to serve today as vice-president of environmental affairs.  *See id.*

During the relevant time period, Darling was represented by both in-house counsel and outside counsel.  David Mellina was hired as outside counsel for Darling in 1994.  *See* Mellina Depo. at 9.  He represented Darling with respect to the sale of the Property to Baywood from approximately 1994 to 1998.  *See id.* at 10.  At some point, Latham & Watkins also began to represent Darling with respect to the sale of the Property to Baywood.  Latham attorneys who worked on the matter included Bob Dahlquist, Jon Demorest, and Ken Whiting.[1]  In 1997, Joe Weaver was hired as general counsel for Darling.  *See* Weaver Depo. at 11.

Baywood is owned by three individuals: Larry Wasem, Borue O'Brien, and Richard Coombs.  *See* Tr. at 119 (testimony of Mr. Wasem).  Mr. O'Brien is the president of Baywood, and Mr. Wasem a vice-president.  *See id.* at 118.  Mr. Wasem is a graduate of Stanford Law School and Stanford Business School.  *See id.*  He is licensed to practice law in Texas but his license is not active.  *See id.*  Mr. Wasem was the Baywood officer primarily responsible for acquisition of the

---

[1] Mr. Whiting eventually left Latham in 2004 for Holme, Roberts & Owen, where he continued to represent Darling.  *See* Tr. at 363-64 (testimony of Mr. Whiting).

United States District Court

For the Northern District of California

1    Property. *See id.* at 119. Since 1990, he has been the primary contact person for Darling with

2    respect to communications relating to the Property. *See id.*

3    B.    1990 Agreement of Purchase and Sale

4          In 1989, the parties entered into negotiations for the purchase and sale of the Property. *See*

5    Jt. Undisputed Facts at 2.

6          On March 16, 1990, the parties executed an Offer to Purchase. *See* Jt. Undisputed Facts at 2;

7    *see also* Ex. B24 (Offer to Purchase, dated 3/16/90). The Offer to Purchase specified that the

8    purchase price of the Property would be $500,000 and that Baywood would make an initial deposit

9    of $10,000 toward the purchase price. *See id.* The Offer to Purchase further specified that

10   "[Baywood] and [Darling] will execute an Agreement of Purchase and Sale . . . , prepared by

11   [Baywood's] counsel, following the agreement of general terms and conditions outlined in this

12   proposal." *Id.* Jim Farrell, a manager at Darling who participated in the negotiations leading up to

13   the sale of the Property to Baywood, *see* Tr. at 754 (testimony of Mr. Farrell), signed the Offer to

14   Purchase on behalf of Darling. Mr. O'Brien signed on behalf of Baywood. *See* Ex. B24.

15         On March 19, 1990, Mr. Wasem sent a letter to Northwestern Title Security Co.

16   ("Northwestern"), which enclosed (1) the Offer to Purchase and (2) a check in the amount of

17   $10,000 made payable to Northwestern. *See* Ex. B510 (letter, dated 3/19/90, from Mr. Wasem to

18   Northwestern); B263 ($10,000 check, dated 3/16/90, issued by Baywood to Northwestern); *see*

19   *also* Jt. Undisputed Facts at 2. Mr. Farrell was carbon copied on the letter. *See* Ex. B510. In the

20   letter, Mr. Wasem noted, *inter alia*, that, "[p]ursuant to the terms of the Offer to Purchase, a more

21   complete Agreement of Purchase and Sale will be deposited with you in the near future." *Id.*

22         On April 30, 1990, the parties executed a Purchase and Sale Agreement ("Agreement" or

23   "1990 Agreement") for the Property. *See* Jt. Undisputed Facts at 2; *see also* Ex. B26 (Agreement).

24   Mr. Farrell signed on behalf of Darling, and Mr. Wasem on behalf of Baywood. *See id.*

25   Subsequently, Darling signed a Memorandum of Agreement which was recorded against the

26   Property in the official records of Sonoma County. *See* Jt. Undisputed Facts at 2; *see also* Ex. B34

27   (Memorandum of Agreement).

28         The relevant terms of the Agreement between Darling and Baywood were as follows.

1.      <u>Document Delivery and Second Deposit</u>

Under the Agreement, by May 10, 1990, Darling was to deliver to Baywood a copy of an environmental report, dated September 15, 1989, prepared by Ecology & Environment, Inc. ("EEI") concerning the underground tanks on the property

> and any and all other toxic and toxicity studies, soils reports,
> groundwater reports, heavy metal reports and other studies and reports
> concerning the presence of any Hazardous Materials at, on, in under or
> about the Subject Property that may be in [Darling's] possession or
> may be otherwise obtainable by [Darling].

Ex. B26 (Agreement ¶ 4.3).

In addition, by May 30, 1990, Darling was to deliver to Baywood "complete and accurate copies of all reports, studies, and other documentation in [Darling's] possession or subject to [Darling's] control concerning [*inter alia*] the physical condition of the Subject Property; . . . the soils condition of the Subject Property; and . . . the presence of Hazardous Materials on the Subject Property."  *Id.* (Agreement ¶ 3.4); *see also id.* (Agreement ¶ 4.2) (defining Hazardous Materials).  If, prior to closing, Darling received or obtained control over other documentation which was not previously delivered by Baywood, then Darling was to "promptly deliver to [Baywood] complete and accurate copies of such reports, studies, or other documentation."  *Id.* (Agreement ¶ 3.4).

Prior to July 6, 1990, Baywood was given the opportunity to inspect the Property.  If Baywood approved of the condition of the Property -- including but not limited to the physical condition of the property, the condition of and exceptions to Darling's title to the Property, and "any and all other aspects of the Subject Property which [Baywood] deems to be material" -- then, by July 6, it would make a second deposit to Northwestern in the amount of $140,000.  *See id.* (Agreement ¶¶ 2.2, 3.1).  The Agreement specified that

> [Baywood's] failure to deliver the Second Deposit with the Escrow
> Holder by July 6, 1990 shall be conclusively deemed to constitute
> failure of [this] condition precedent . . . .  This condition precedent is
> for the benefit of [Baywood] only, and may be waived by [Baywood]
> only by way of a written and signed waiver.  If this condition
> precedent is not satisfied or waived . . . , then this transaction shall be
> cancelled, and on the day after the failure of condition, the Escrow
> Holder shall return to [Baywood] the Initial Deposit, together with all
> interest earned thereon.

*Id.* (Agreement ¶ 3.1).

United States District Court

For the Northern District of California

2.      Tank Report and General Report

Prior to execution of the Agreement, Darling had engaged EEI to prepare an environmental investigation of the underground tanks on the property and the soils, surface water, and groundwater in proximity thereto. *See id.* (Agreement ¶ 4.4.1).  The results of the environmental investigation were known as the "Tank Report."  *See id.*

Upon execution of the Agreement, Darling and Baywood were to engage a qualified soils engineering firm to prepare a general "Phase 1" environmental investigation of the Property.  The results of the investigation were known as the "General Report."  *See id.* (Agreement ¶ 4.4.2).

Upon completion of the Tank Report and General Report, Darling was to submit the reports

> (or an appropriate written summary, disclosure, work plan or other notice approved by [Darling] and [Baywood]) to the appropriate agency of the County of Sonoma and to any and all other local, regional, state or federal agencies and bodies which may govern, control, regulate or otherwise possess jurisdiction over the presence of petroleum products and Hazardous Materials generally . . . which in the reasonable opinion of counsel for [Darling] and [Baywood] are required by law to receive notice of the information contained in the Tank Report and/or the General Report.

*Id.* (Agreement ¶ 4.4.3).

3.      Remediation

Either prior to or after close of escrow, Darling was required to remediate the Property. More specifically, Darling was

> to remove all underground tanks . . . that may be situated on the Subject Property in the manner required by law and to remove, contain and/or remediate all Hazardous Materials in the soils, surface water and groundwater at, on, in, under or about the Subject Property, including, without limitation, all asbestos and waste products from underground cisterns.

*Id.* (Agreement ¶ 4.1); *see also id.* (Agreement ¶ 4.5).  The remediation was to be "supervised by a qualified soils engineering firm reasonably acceptable to [Darling], [Baywood] and the Public Agencies (the 'Supervising Consultant')."  *Id.*

If the cost of remediation was $200,000 or less, then Darling was to "comply without delay with all orders and directives of the Public Agencies and to perform without delay the Remediation Work."  *Id.*  If, however, the remediation cost were to exceed $200,000 or could not be calculated

-5-

with reasonable certainty by July 29, 1990, then Darling could "elect to postpone the Remediation Work by delivery of written notice to [Baywood]." *Id.* If Baywood did not receive a postponement notice within 30 days of determination of the remediation cost in excess of $200,000, then Darling was "conclusively deemed to have elected to proceed with the Remediation Work at [its] cost and expense." *Id.* If Baywood did receive a postponement notice by that date, then it had the option of (1) terminating the Agreement and getting back all deposits; (2) paying the remediation cost in excess of $200,000 and demanding Darling to perform all acts needed for the close of escrow; or (3) doing nothing, in which case Darling had fifty-nine years from the execution of the Agreement to complete the remediation work or contract for the completion of the remediation work, and remediation work would be completed after the close of escrow. *See id.* (Agreement ¶¶ 4.5.1-4.5.3).

Remediation was deemed to be complete

> after (i) the Remediation Work has been accepted and approved by the Supervising Consultant and all Public Agencies as having been completed to a level below action levels for commercial and industrial use and development or as having been completed in the manner required by the remediation work plan approved by the Public Agencies; and (ii) the Supervising Consultant and any and all other consultants and contractors employed in the Remediation Work have been paid in full and have executed unconditional final releases of lien or sixty (6) calendar days have elapsed since the recordation of a Notice of Completion without filing of a mechanics lien claim, whichever date occurs latest. . . . Remediation Work shall be deemed to be complete even if Purchaser must maintain monitoring wells after the completion and acceptance of the balance of the Remediation Work.

*Id.* (Agreement ¶ 4.7).

    4.    <u>Close of Escrow and Conditions Precedent to Closing</u>

Escrow was to close thirty days after the date on which all conditions precedent to closing may have occurred. *See id.* (Agreement ¶ 6.1). Among the conditions precedent to closing were the following:

(1)    Baywood must have approved the condition of the property in the manner described in ¶ 3.1 of the Agreement -- *i.e.*, it must have made the second deposit.

(2)    Title to the Property was to be subject only to certain permitted conditions of title.

**United States District Court**
For the Northern District of California

1  (3)   Darling had either completed the remediation work or entered into a contract for completion

2         of the remediation work.

3  *See id.* (Agreement ¶ 6.3).

4         The above condition precedents either had to be satisfied or waived prior to closing.  *See id.*

5  If not, then the Agreement would terminate.  *See id.* (Agreement ¶ 6.4).

6         5.   <u>Title and State Lands</u>

7         Under the Agreement, Baywood was given an opportunity to approve, conditionally approve,

8  or disapprove of any mortgage, lien, or encumbrance shown on the preliminary title report for the

9  Property.  If Baywood disapproved or only conditionally approved

10              any lien or encumbrance which [Darling] is reasonably able to remove
                by the closing, [Darling] shall with due diligence attempt to remove
11              immediately any disapproved or conditionally approved lien or
                encumbrance from the Subject Property; provided, however, that
12              [Darling] shall not be obligated to make any payments of cash to the
                holders of any disapproved or conditionally approved liens or
13              encumbrances or incur substantial costs in connection with the
                removal of any encumbrances or lien.

14

15  *Id.* (Agreement ¶ 5.1).

16         The Agreement specifically provided that Darling was not "required to remove . . . any

17  claims of the State of California . . . resulting from its ownership of and jurisdiction over tidelands

18  and public trust property."  *Id.*  The Agreement further provided that Darling would refrain from

19  placing any additional lien or encumbrance against the Property.  *See id.* (Agreement ¶ 5.3).  Title to

20  the Property was to be conveyed to Baywood at the close of escrow free and clear of all liens,

21  encumbrances, restrictions, and rights of way of record, subject to only three specific permitted

22  conditions of title.  *See id.* (Agreement ¶ 5.2).

23         6.   <u>Environmental Indemnification</u>

24         Under the Agreement, Darling agreed

25              to fully and forever indemnify, protect, defend and hold [Baywood]
                free and harmless from and against any and all claims . . . , demands . .
26              . , actions, causes of action, suits, administrative proceedings . . . ,
                expenses, or costs . . . arising out of, whether directly or indirectly, or
27              in any way connected with the existence of any Hazardous Material, in
                any state or form, in excess of legally complying levels for
28              commercial or industrial use or development, at, on, in, under or about

the Subject Property . . . which has been caused by Seller or its Affiliates.

*Id.* (Agreement ¶ 4.9.1).

       7.     <u>Miscellany</u>

          a.     <u>Integration Clause</u>

The Agreement contained an integration which specified as follows: "This Agreement contains the entire agreement of the parties hereto with respect to the matters covered hereby and supersedes all prior or contemporaneous written or oral arrangements and understandings between the parties in regard to the . . . Property . . . ." *Id.* (Agreement ¶ 18.3).

          b.     <u>Time-of-the-Essence Clause</u>

The Agreement also contained a clause providing that time was of the essence. More specifically, the Agreement stated: "Time is of the essence of this Agreement, and each and every provision thereof." *Id.* (Agreement ¶ 18.8).

C.    <u>Escrow</u>

A valid escrow was formed for the sale of the Property in 1990 – at the latest by April 30, 1990, when the Agreement was executed. Mr. Farrell admitted that an escrow had been opened, *see* Tr. at 754 (testimony of Mr. Farrell), and he was the Darling employee who had primary responsibility for the sale of the Property at the time that it was sold. Mr. Phillips also admitted that an escrow had been opened, *see* Phillips Depo., vol. I, at 18, and he was the Darling employee who succeeded Mr. Farrell in terms of responsibility for the sale of the Property. Mr. Mellina, one of the main attorneys who represented Darling with respect to the sale of the Property, likewise made the same admission as Mr. Farrell and Mr. Phillips. *See* Mellina Depo. at 19. Moreover, Mr. Mellina's attempt on May 1, 1997, to have Baywood make the second deposit was a further admission that a valid escrow had been created. *See* Ex. B185 (letter, dated 5/1/97, from Mr. Mellina to Mr. Wasem).

Apart from Darling's admissions, there is independent evidence that a valid escrow was formed for the sale of the Property. Baywood's expert, Charles Hansen testified convincingly (and Darling in fact agreed) that the key to the creation of an escrow is whether a dual agency has been established. *See* Tr. at 296 (testimony of Mr. Hansen); Tr. at 927-28 (Darling's closing argument).

1   Here, Northwestern did become an agent for both Darling and Baywood. Mr. Wasem sent to

2   Northwestern the Offer to Purchase – a document signed by both parties – along with a $10,000

3   check, and Darling was aware of this fact as Mr. Farrell was carbon copied on Mr. Wasem's letter to

4   Northwestern transmitting the same. *See* Ex. B510 (letter, dated 3/19/90, from Mr. Wasem to

5   Northwestern). The Agreement – again, a document signed by both parties – specifically identified

6   Northwestern as the escrow holder with respect to the sale of the Property, *see* Ex. B26 (Agreement

7   ¶ 6.2), and contained sufficient instructions for Northwestern as escrow holder. Northwestern

8   received a copy of the Agreement. The fact that Northwestern never received formal written

9   opening instructions separate from the Agreement is not dispositive. Mr. Hansen testified -- and

10  Darling did not present any evidence to the contrary -- that, during the 1990s, approximately one-

11  third of the escrows opened did not have formal written opening instructions. *See* Tr. at 346

12  (testimony of Mr. Hansen). Similarly, Daryl Stigers, the chief title officer of New Century (formerly

13  Northwestern) indicated that "fairly often, especially with large commercial transactions," there

14  were no formal written opening instructions. Tr. at 711-12 (testimony of Mr. Stigers).

15      The escrow that was opened for the sale of the Property by Darling to Baywood never

16  terminated, regardless of whether the Agreement between the parties terminated as of May 31, 1997,

17  or some later date. Both Mr. Hansen and Mr. Stigers credibly testified that Northwestern would

18  need mutual cancellation instructions from Darling and Baywood in order to terminate the escrow,

19  even though the Agreement provided that, if no second deposit was timely made, then "the Escrow

20  Holder shall return to [Baywood] the Initial Deposit, together with all interest earned thereon." Ex.

21  B26 (Agreement ¶ 3.1); *see also* Tr. at 334 (testimony of Mr. Hansen); *id.* at 706 (testimony of Mr.

22  Stigers). As Mr. Hansen explained, the escrow holder would not terminate escrow without mutual

23  instructions in spite of this "command" in the Agreement because, if it did so, it would be "leaving

24  [itself] open to horrible [potential] liability." *Id.* at 334 (testimony of Mr. Hansen). This would, of

25  course, be especially true where the parties dispute whether the Agreement terminated and whether

26  legal obligations continued under such legal theories as waiver and estoppel.

27

28

**United States District Court**
For the Northern District of California

D.      Amendments to Agreement

From June 27, 1990, through February 1, 1997, the parties executed fourteen different amendments to the Property.  *See* Jt. Undisputed Facts at 2.  Each of the fourteen amendments extended (1) the time for Baywood to inspect the Property and make the second deposit and (2) the time for Darling to deliver a postponement notice.

Each of the fourteen amendments claimed that the reason for the amendment was Darling's failure to have the Tank Report completed.  For example, the Second Amendment provided:

> Pursuant to the terms of Paragraph 4.4.1 of the Agreement, [Darling] is required to authorize EEI to finalize the Tank Report.  [Darling] has authorized EEI to finalize the Report but has discovered that the Tank Report will take longer than [Darling] anticipated for EEI to generate the Tank Report.  In recognition thereof, [Darling] and [Baywood] extended the Property Inspection in the Manner described in the First Amendment.  As of the date of execution of this Second Amendment, the Tank Report is not complete.

> In light of the foregoing and in order to afford [Baywood] the opportunity to inspect the Subject Property in the manner originally contemplated by the Agreement and the First Amendment and to preserve otherwise the benefits to [Darling] of the Agreement and the First Amendment, [Darling] and [Baywood] agree to extend further the time period for inspection of the Subject Property in the manner described in Paragraph 3.1 of the Agreement as amended by Paragraph 3 of the First Amendment from September 15, 1990 to November 15, 1990.  If [Baywood] should approve of the Subject Property, the date [Baywood] must make the Second Deposit shall similarly be extended from September 15, 1990 to November 15, 1990.

*See* Ex. B502 (Second Amendment).

Under the last amendment entered into by the parties -- *i.e.*, the Fourteenth Amendment -- Baywood had until May 1, 1997, to inspect the Property and make the second deposit; Darling then had until May 24, 1997, to deliver a postponement notice.  *See* B83 (Fourteenth Amendment).

Although all fourteen of the Amendments referred to an incomplete Tank Report as the reason for extending time, the Tank Report was completed and Baywood had a copy of the Tank Report by, at the latest, 1993 (though it was not obtained directly from Darling).

Under the Agreement, the Tank Report was defined as the results of the environmental investigation of EEI.  *See* B26 (Agreement ¶ 4.4.1).  On August 27, 1990, Baywood received from Darling a copy of an executive summary for the latest tests conducted by EEI.  *See* Ex. B509 (letter,

-10-

United States District Court

For the Northern District of California

dated 8/27/90, from Mr. Farrell to Mr. Wasem).  Moreover, Baywood and/or its environmental

consultant had a copy of the complete EEI report in their files, as well as a copy of a supplemental

report by EEI, *see* Ex. 563 (Underground Storage Tank Site Characterization Report, dated 8/14/90,

by EEI); Ex. 552 (letter, dated 8/23/91, from Mr. Morin to Mr. Roshanravan), and Mr. Wasem

confirmed that he had EEI's output by 1993.  *See* Tr. at 207 (testimony of Mr. Wasem).

Furthermore, it is clear that Baywood had all the information that it needed regarding the tanks by

May 26, 1993, when it received a copy of the Dames & Moore (its environmental consultant)

feasibility study which cited the Tank Report.  *See* Ex. B289 (letter, dated 5/26/93, from Mr. Clark

to Mr. Wasem); *see also* Ex. 562 (feasibility study, dated 2/8/93, by Dames & Moore) (referencing

EEI reports in Section 8.0).

        Admittedly, the Amendments after August 23, 1991 (the date of EEI's supplemental report)

and May 26, 1993 (the date Baywood received the Dames & Moore feasibility study) continued to

refer to an incomplete Tank Report.  However, the reference to the Tank Report in these

Amendments was an anachronism.  Notably, in letters asking for the early Amendments to be

signed, Baywood stated that the extensions of time would give Darling time to finalize its

"environmental studies."  Ex. B505 (letter, dated 1/29/91, from Mr. Wasem to Mr. Farrell); Ex. B47

(letter, dated 3/29/91, from Mr. Wasem to Ms. Rubin).  However, by the time of the Sixth

Amendment, Baywood no longer referred to any incomplete environmental studies, *see* Ex. 55

(letter, dated 10/16/91, from Mr. Wasem to Mr. Mellina), and, in letters asking for the later

Amendments to be signed, Baywood's concern instead was the unfinalized title settlement

agreement with the California State Lands Commission.[2]  *See, e.g.*, Ex. B70 (letter, dated 4/24/95,

from Mr. Wasem to Mr. Mellina); Ex. B284 (letter, dated 4/24/96, from Mr. Wasem to Mr. Mellina);

Ex. B297 (letter, dated 8/13/96, from Mr. Wasem to Mr. Mellina); Ex. B298 (letter, dated 10/23/96,

from Mr. Wasem to Mr. Mellina); Ex. B299 (letter, dated 2/28/97, from Mr. Wasem to Mr. Mellina).

---

        [2] By the time of the Eleventh Amendment, it was apparent that it was Baywood who wanted the extensions of time, in particular, so that it could finalize the title settlement agreement with the California State Lands Commission.  Further, by the time of the Eleventh Amendment, Darling was resisting prolonged extensions of time.  *See, e.g.*, Ex. B76 (Eleventh Amendment) (agreeing to a three-month extension only instead of a year-long extension); Ex. B78 (Twelfth Amendment) (same); Ex. B81 (Thirteenth Amendment) (same); Ex. B83 (Fourteenth Amendment) (same).

1  Moreover, it is notable that, in Mr. Wasem's letters to Mr. Mellina, dated May 1 and 1, 1997, in

2  which Baywood's grievances were specifically itemized, an incomplete Tank Report was never

3  mentioned.  Nor did Baywood ask for the Tank Report at any time after 1991.

4  E.      Termination of Agreement on May 31, 1997

5          On March 11, 1997, Sonoma County's Department of Health Services sent a letter to Darling

6  regarding the Property.  *See* Ex. B186 (letter, dated 3/11/97, from Ms. Allen to Mr. McMurtry); *see*

7  *also* Jt. Undisputed Facts at 2.  In the letter, the Department stated that,

8               [b]ased on the information submitted to this office and the San
                Francisco Regional Water Quality Control Board, no further remedial
9               action will be needed at this site if after two years of semi-annual
                monitoring there is no evidence of adverse pollutant migration.  At the
10              end of the two year monitoring period, the site will be evaluated for
                closure.

11

12  Ex. B186.

13          Subsequently, on April 22, 1997, Mr. Wasem sent to Mr. Mellina a letter, asking that Darling

14  sign a proposed Fifteenth Amendment to the Agreement.[3]  *See* Ex. B87 (letter, dated 4/22/97, from

15  Mr. Wasem to Mr. Mellina).  This proposed Amendment, like the Amendments that had preceded it,

16  extended the time for Baywood to inspect the Property and make the second deposit and the time for

17  Darling to deliver a postponement notice.

18          On May 1, 1997, Mr. Mellina sent a letter in response, which enclosed a copy of the letter

19  from Sonoma County's Department of Health Services.  *See* Ex. B185 (letter, dated 5/1/97, from Mr.

20  Mellina to Mr. Wasem); *see also* Jt. Undisputed Facts at 2.  In his letter, Mr. Mellina stated that

21  Darling had completed its remediation obligations under the Agreement, as evidenced by the

22  Department's letter, and therefore it made no sense to give additional extensions of time (as

23  provided for in the proposed Fifteenth Amendment).  However, as an accommodation, Darling

24  would give Baywood an additional thirty days to inspect the Property and make the second deposit

25  (*i.e.*, until May 31, 1997).  *See* Ex. B185.  Mr. Mellina also stated that Baywood would have to

26  deliver the remainder of the purchase price at that time and close the transaction.  *See id.*

27  ───────────────

28          [3] Ultimately, from 1997 to 2004, Wasem asked Darling multiple times to sign a proposed
    Fifteenth Amendment, but none was ever executed.  *See* Jt. Undisputed Facts at 2.

United States District Court

For the Northern District of California

1    Mr. Wasem sent two letters in response, in which he argued that Darling had not satisfied its

2 remediation obligations and further that there were title objections that needed to be resolved prior

3 to closing.  *See* Ex. B287 (letter, dated 5/1/97, from Mr. Wasem to Mr. Mellina); Ex. B288 (letter,

4 dated 5/2/97, from Mr. Wasem to Mr. Mellina); *see also* Jt. Undisputed Facts at 3.

5    Baywood did not deliver the second deposit into escrow by May 31, 1997.

6    Because Baywood did not deliver a second deposit by May 31, 1997, the Agreement between

7 Darling and Baywood terminated.  *See* B26 (Agreement ¶ 3.1) ("[Baywood's] failure to deliver the

8 Second Deposit with the Escrow Holder . . . shall be conclusively deemed to constitute failure of

9 [this] condition precedent . . . .  This condition precedent is for the benefit of [Baywood] only, and

10 may be waived by [Baywood] only by way of a written and signed waiver.  If this condition

11 precedent is not satisfied or waived . . . , then this transaction shall be cancelled, and on the day after

12 the failure of condition, the Escrow Holder shall return to [Baywood] the Initial Deposit, together

13 with all interest earned thereon.").

14    There were no condition precedents that Darling failed to satisfy which would relieve

15 Baywood of its obligation to make the second deposit on May 31, 1997.

16    Document delivery, for example, *see* B26 (Agreement ¶ 3.4), was not a condition precedent

17 to the funding of the second deposit.  The second deposit was discussed in ¶¶ 2.2 and 3.1 of the

18 Agreement; neither paragraph expressly linked the second deposit to the delivery of documents.  In

19 fact, under the original terms of the agreement, the second deposit was to be funded only two

20 months after the date of the Agreement.  *See id.* (Agreement ¶ 3.1) (requiring the second deposit to

21 be made by July 6, 1990).  Even if the delivery of such documents could be implicitly deemed a

22 condition precedent (or concurrent), it was limited to delivery of documents that Darling had in its

23 possession or control as of May 30, 1997 (although Darling had a continuing obligation to provide

24 documents to Baywood).

25    Furthermore, delivery of the Tank Report was not a condition precedent to Baywood's

26 funding of the second deposit, at least not in the initial Agreement.  The provisions in the Agreement

27 that discussed the second deposit did not make any reference to the Tank Report.  *See id.*

28 (Agreement ¶¶ 2.2, 3.1).  Furthermore, the Tank Report was not identified as one of the documents

**United States District Court**
For the Northern District of California

1  that needed to be provided to Baywood by May 30, 2007, under ¶ 3.4 of the Agreement.  Based on

2  the initial Agreement, the only purpose of the Tank Report was to inform the scope of Darling's

3  remediation obligation under ¶ 4.1 of the Agreement.  This is the reason why the Agreement

4  required the Tank Report be submitted by Darling to the appropriate governmental agencies.  *See*

5  B26 (Agreement ¶ 4.4.3).  While it appears that the Tank Report may have become a condition

6  precedent to Baywood's funding of the second deposit based on the Amendments to the Agreement,

7  which seemed to link the two (thereby modifying the Agreement), as discussed above, the Tank

8  Report condition precedent was substantially satisfied by Darling since it was made publicly

9  available to Baywood -- or if not satisfied, was waived by Baywood -- long before May 31, 1997.

10  Baywood had the Tank Report by 1993 and did not thereafter seek it from Darling nor did Baywood

11  interpose it as a reason for refusing to make the second deposit.  Darling had no reason to believe

12  delivery of the Tank Report was still a condition to the second deposit.

13  F.    <u>Waiver</u>

14        Although the Agreement terminated because of Baywood's failure to fund the second deposit

15  by May 31, 1997, the Court finds that Darling waived its right to claim contract termination based

16  on the untimely deposit.  Darling engaged in conduct that was known to Baywood and which

17  induced in Baywood a reasonable belief that Darling was waiving its right to claim contract

18  termination based on untimely delivery of the second deposit.

19        Conduct by Darling which induced in Baywood a reasonable belief that Darling was waiving

20  its right to claim contract termination based on untimely delivery of the second deposit includes the

21  following.

22  •     On February 16, 2000, Baywood delivered the second deposit to the escrow holder, New

23        Century Title Company (formerly known as Northwestern).  Darling was aware of this fact

24        because Mr. Wasem informed Mr. Phillips and Mr. Demorest of such by e-mail and letter.

25        *See* Ex. B190 (e-mail, dated 2/16/00, from Mr. Wasem to Mr. Phillips).  However, neither

26        Mr. Phillips nor Mr. Demorest, nor any other Darling representative, objected to the delivery

27        of the second deposit.  For example, no Darling representative communicated to Baywood or

28

United States District Court

For the Northern District of California

to New Century that the funding of the second deposit was untimely and that the Agreement had terminated.

- On April 28, 2000, Mr. Wasem sent an e-mail to Mr. Demorest, noting again that Baywood had made the second deposit to escrow and that Baywood was ready, willing, and able to close. *See* Ex. B194 (e-mail exchange, dated 4/00, involving Mr. Demorest and Mr. Phillips). Mr. Wasem forwarded that letter to Mr. Phillips, and Mr. Phillips forwarded the letter to Mr. Weaver, in-house counsel for Darling. *See id.* However, Baywood did not receive a response from either Mr. Demorest or Mr. Phillips, or for that matter Mr. Weaver.

- On June 21, 2000, Mr. Wasem sent an e-mail to Mr. Demorest, asking for an update and if there was "anything we can do to help move the agencies along?" *See* Ex. B117 (e-mail exchange, dated 6/00, between Mr. Wasem and Mr. Demorest). In his response, Mr. Demorest did not state that the Agreement had terminated. Instead, he replied that Mr. Wasem should review the General Report "to verify whether you agree that, but for this outstanding soils issue, Darling has completed all of the work required of Darling under the purchase agreement." *Id.* Mr. Demorest also commented that Baywood should finalize the title settlement agreement with the California State Lands Commission, which was "hung up" because of Baywood's reluctance to grant an easement to the State over its own property. *Id.* Even after Mr. Wasem responded that Baywood would be granting the easement because it was no longer concerned that Darling had not confirmed in writing the status of the Agreement given the fact that Baywood had made the second deposit, Mr. Demorest never replied that the Agreement had terminated because the second deposit was not timely made.

- On November 27, 2000, Mr. Wasem sent an e-mail to Mr. Phillips, reminding him again that Baywood had made the second deposit. *See* Ex. B196 (e-mail, dated 11/27/00, from Mr. Wasem to Mr. Phillips). Mr. Wasem also noted that one of his partners "heard a rumor the other day that Darling Delaware was working with another Texas company on the property. Obviously, this would be an extreme breach of our Agreement." *Id.* Mr. Phillips did not

respond to Mr. Wasem, stating, *e.g.*, that the second deposit was untimely and therefore there could not be a breach of an already terminated contract.

- On November 28, 2000, Mr. Wasem sent an e-mail to Mr. Phillips regarding a conversation the two had had that day. *See* Ex. B197 (e-mail, dated 11/28/00, from Mr. Wasem to Mr. Phillips). Mr. Demorest was carbon copied on the e-mail. In the e-mail, Mr. Wasem stated that "[y]ou assured me that Darling intends to honor its Agreement of Purchase and Sale with Baywood Partners and does intend to sell the Property to Baywood Partners pursuant to the terms of that Agreement." *Id.* Neither Mr. Phillips nor Mr. Demorest responded to refute this statement by Mr. Wasem. This silence is corroborative of Mr. Wasem's claim.

- On March 12, 2002, Mr. Wasem sent an e-mail to the California State Lands Commission regarding the title settlement agreement. *See* Ex. B229 (e-mail exchange, dated 3/02, involving Mr. Phillips). Mr. Phillips was carbon copied on the e-mail. In the e-mail, Mr. Wasem stated that "Baywood is in contract with Darling to purchase the land which is the subject of the Title Settlement Agreement" and, in reliance on that Agreement, was amenable to granting the State an easement over its own property. *Id.* Mr. Phillips subsequently forwarded the Wasem e-mail to Darling's in-house counsel, Mr. Weaver. Neither Mr. Phillips nor Mr. Weaver responded to Mr. Wasem or to the State, refuting the statements made in the e-mail.

- On June 3, 2002, Mr. Phillips sent a letter to Mr. Wasem, on which Mr. McMurtry and Mr. Weaver were carbon copied, asking Mr. Wasem to provide any comments on a temporary construction easement across the Property that Darling intended to grant the City of Petaluma. *See* Ex. B230 (letter, dated 6/3/02, from Mr. Phillips to Mr. Wasem). The fact that Darling sought Baywood's comments on the Property implied to Baywood that Darling assumed the 1990 Agreement continuing in existence.

- Several times after May 31, 1997, Mr. Wasem informed a Darling representative (*e.g.*, Mr. Demorest, Mr. Phillips, Mr. Mellina) that Baywood was "ready, willing and able to close the transaction under [or pursuant to] the terms of the Agreement." *See, e.g.*, Ex. B200 (letter, dated 3/17/98, from Mr. Wasem to Mr. Demorest); Ex. B203 (letter, dated 3/30/01, from Mr.

Wasem to Mr. Phillips).  Even if this did involve some posturing on the part of Mr. Wasem, Darling failed to respond to Mr. Wasem's statements.

•   From 1997 to 2004, Darling did not make any demand to Baywood that the recorded Memorandum of Agreement be removed.  If the Agreement had in fact terminated, then there was no reason for the Memorandum of Agreement to remain on record with Sonoma County, which would be a potential bar to the sale of the Property to any other buyer.  Even if Darling did not want to alienate Baywood because it was the most likely buyer of the Property,[4] Darling reasonably could have continued negotiations with Baywood and, at the same time, ask that the recorded Memorandum of Agreement be removed since the Agreement was no longer in force and effect.

•   From 1997 to at least 2002, Baywood kept Darling apprised of Baywood's negotiations with the California State Lands Commission on the title settlement agreement with respect to the Property.  Under the 1990 Agreement, the obligation of removing claims by the State belonged to Baywood, and not Darling.  *See* Ex. B26 (Agreement ¶ 5.1).  There was little reason for Baywood to shoulder this responsibility if the 1990 Agreement was no longer in effect.  Yet Darling did not discourage Baywood from continuing its negotiations nor did Darling ever inform Baywood that the work it was doing was for naught because the Agreement had terminated.  Even if Baywood was the most likely buyer of the Property, Darling reasonably could have cautioned Baywood that any expenditures of resources on the title settlement agreement was at its own risk since the Agreement had terminated.

Contrary to what Darling argues, it did not give Baywood sufficient notice that the Agreement had terminated as of May 31, 1997.  Admittedly, in his letter of May 1, 1997, Mr.

---

[4] Baywood was one of the likeliest buyers, if not the most likely, because it owned adjacent property to the Darling Property which made the Darling Property accessible.  Of course, after Darling entered into the Agreement with Baywood, Darling received offers that were worth significantly more than what Baywood was paying under the Agreement.  *See, e.g.*, Ex. B191 (letter, dated 2/24/00, from Mr. Lipman to Mr. Phillips) (offering to buy the Property for $1,650,000);.Ex. B210 (letter, dated 3/31/05, from Mr. Heaton to Darling) (offering to purchase the Property for $20,000,000); *see also* Ex. B216 (appraisal, dated 10/25/97, by Marshall & Stevens, Inc.) (estimating that the Property was worth approximately $900,000); Ex. B474 (facsimile, dated 9/27/04, from Mr. Krantz to Mr. Whiting) (noting that the Property was "worth much more than the value in the 1990 contract").

United States District Court

For the Northern District of California

1  Mellina set a deadline of May 31, 1997, for delivery of the second deposit, *see* Ex. B185 (letter,

2  dated 5/1/97, from Mr. Mellina to Mr. Wasem), which did subject Baywood to the risk that Darling

3  would claim contract termination if Baywood failed to fund by that date.  However, nowhere in the

4  May 1 letter did Mr. Mellina plainly and expressly state that failure to make the second deposit

5  would in fact terminate the Agreement.  Notably, Mr. Mellina did not make such a statement even

6  after Mr. Wasem sent responsive letters on May 1 and 2, 1997.  *See* Ex. B287 (letter, dated 5/1/97,

7  from Mr. Wasem to Mr. Mellina); B288 (letter, dated 5/2/97, from Mr. Wasem to Mr. Mellina).

8  Darling's conduct was at best ambiguous.

9          Similarly, in a subsequent letter, dated February 4, 1998, Mr. Mellina again did not plainly

10  state the contract had terminated.  *See* Ex. B198 (letter, dated 2/4/98, from Mr. Mellina to Mr.

11  Wasem).  Mr. Mellina chose not to state in his letter that the Agreement was no longer in force and

12  effect, although he easily could have as demonstrated by his initial draft of the February 4 letter

13  which used that precise language.  *See* Ex. B199 (draft letter, undated, from Darling to Mr. Wasem).

14  Instead, Mr. Mellina simply stated that Darling's provision of environmental reports regarding the

15  Property was a courtesy only and "shall not imply any acknowledgment of continuing obligations on

16  the part of Darling under that certain Agreement of Purchase and Sale dated April 30, 1990, between

17  Darling and Baywood Partners, Inc."  *Id.*  At most, this statement gave notice to Baywood that

18  Darling was reserving its right to contend contract termination; it was not a statement, unequivocal

19  or otherwise, that the Agreement had in fact terminated.

20          Finally, at the site visit on March 3, 1998, neither Mr. Phillips nor Mr. Demorest expressly

21  stated to Mr. Wasem that the Agreement regarding the Property had terminated.  *See, e.g.*, Demorest

22  Depo., vol. I, at 14.  Although there was discussion among the three about structuring a different

23  environmental indemnity provision, this was not enough to convey to Baywood that the Agreement

24  had in fact terminated.  While such a discussion could be interpreted as seeking a new contract, it

25  equally implied that the parties were negotiating an *amendment* to the existing 1990 Agreement.

26  Neither Mr. Phillips nor Mr. Demorest clearly asserted the Agreement had terminated.  Neither Mr.

27  Phillips nor Mr. Demorest testified that either expressly stated such at the meeting.

28

That Darling never explicitly told Baywood that the Agreement had terminated is corroborated by Darling's contention that it did not want to take any action to antagonize Baywood, the most likely buyer of the Property.  It is also consistent with the fact that as time went on the value of the property increased, a fact which the Court finds informed Darling's decision finally to assert contract termination in 2004.  *See n.4*, *supra*, and Ex. B206 (letter, dated 10/1/04, from Mr. Whiting to Mr. Wasem) (stating that "Darling considers the 1990 Agreement to be terminated" and asking Mr. Wasem to provide any comments on an enclosed proposed agreement for purchase and sale if Baywood remained interested in purchasing the Property -- the purchase price in the proposed agreement was left blank).

Furthermore, contrary to what Darling argues, Baywood's belief that Darling had waived its right to contract termination was still reasonable even though Darling did not sign any of the proposed Fifteenth Amendments, *see* Jt. Undisputed Facts at 2; and did not affirm the Agreement in response to Mr. Wasem's pleas.  *See, e.g.*, Ex. B290 (facsimile, dated 7/7/97, from Mr. Wasem to Mr. Mellina) ("I am not really pressing the issue of bringing the contract back in line.  However, it has been awhile and I would really like to get back to an understanding."); Ex. B291 (letter, dated 2/9/98, from Mr. Wasem to Mr. Phillips) ("***Brad, I think it only fair and proper that Darling acknowledge its obligations and formally extend the Agreement.***  While I am confident that, based on my conversations with you, Darling intends in every way to honor the Agreement and that Darling's failure to previously execute the [Fifteenth] Amendment was not meant to imply that Darling did not recognize its contractual obligations, it is appropriate to bring the Agreement back up to date.") (emphasis in original); Ex. B221 (e-mail exchange, dated 5/98, between Mr. Wasem and Mr. Phillips) ("I just want everyone to acknowledge that the contract is alive and well and I want some assurances that Darling Delaware's delays are not being used to establish some type of case against me.").  Darling's failure to sign the proposed Amendments and affirm the Agreement should have caused -- and did cause -- Baywood to be concerned about the possibility that Darling might claim contract termination.  But Darling never so stated to Baywood.  Contract termination was a mere possibility, not a probability, much less a certainty.  More importantly, Baywood's concerns were greatest *prior* to the time that Baywood funded the second deposit.  Once Baywood

United States District Court

For the Northern District of California

delivered the second deposit on February 16, 2000, Darling's failure to disabuse Baywood of Baywood's belief that Darling accepted the deposit and considered the contract valid substantially diminished any concern Baywood may have had about the continued existence of the Agreement.

Admittedly, in 2003, Darling did refuse to sign the proposed grant of easement from Baywood to the State -- which contained the statement that the Agreement between Darling and Baywood with respect to the Property "continues in full force and effect," Ex. B238 (proposed grant of easement). Again, however, Darling never plainly and expressly stated that it refused to sign the proposed grant because it believed the Agreement had terminated back on May 31, 1997. Mr. Weaver simply testified: "I explained to [Mr. Wasem] that we didn't like the contract, that we found it confusing and convoluted, ambiguous, and we didn't like it. And we weren't going to ratify it. And I think I said that he didn't need that contract to do what he wanted to do or what was being asked of him, which was the easement over [Baywood's] property." Weaver Depo. at 41. Mr. Weaver's handwritten notes on his conversation with Mr. Wasem stated only that "[w]e wouldn't send and sign his easement doc affirming the sale contract" and "[t]old him contract spoke for itself." *Id.* at 43. Contrary to Darling's argument at trial, this did not send up a "red flag" for Baywood.

Darling's conduct with respect to parties other than Baywood (even if not communicated to Baywood) corroborates the finding that Darling believed the 1990 Agreement not to be terminated, *i.e.*, to be in full force and effect, and behaved accordingly. That conduct as to third parties included the following:

• In the fall of 1999, a credit agreement between Darling (as borrower) and BankBoston (as lender) was being amended and restated. *See* Sims Depo. at 11. In connection with the amendment and restatement, Mr. Phillips provided a copy of the Agreement to BankBoston's counsel, Laura Sims of Jenkens & Gilchrist -- apparently because the Property was one of Darling's properties that served as security for the loan by BankBoston. *See* Ex. B400 (letter, dated 8/2/99, from Mr. Phillips to Ms. Sims). Neither Mr. Phillips nor any other representative informed BankBoston or its counsel that the Agreement had terminated back in 1997. In fact, when Ms. Sims sent an e-mail to Janet Follstaedt of Winstead, counsel who

United States District Court

For the Northern District of California

represented Darling with respect to the amendment and restatement, stating that "I just can't believe that the Agreement is still in effect 9 years later, but I'd like to know more," Ms. Winstead responded: "Believe it, I will confirm with Brad, but Brad has told me that the person who negotiated the contract was fired and fired b/c of that contract."  Ex. B B433 (e-mail exchange, dated 9/99, between Ms. Sims and Ms. Follstaedt).  Furthermore, Darling notably made the decision not to tell Baywood about the additional lien being placed on the Property by virtue of the amended and restated credit agreement with BankBoston.  *See* Ex. B370 (e-mail exchange, dated 10/99, involving Ms. Follstaedt); *see also* Ex. B435 (Ms. Sim's memo to file, dated 12/31/99).  If Darling had informed Baywood of this fact, then Baywood would no doubt have argued breach of the Agreement, *see* Ex. B26 (Agreement ¶ 5.3) (providing that Darling would refrain from placing any additional lien or encumbrance against the Property), in which case Darling would have been compelled to either admit that it was in breach because the Agreement was still in effect or clearly state there was no breach because the Agreement had terminated.

- Shortly after Baywood funded the second deposit, Mr. McMurtry asked Baywood's environmental consultant to provide him with environmental reports.  *See* B276 (facsimile, dated 2/23/00, from Mr. Clark to Mr. McMurtry).  If the Agreement had terminated, then there was little reason for Mr. McMurtry to engage with Baywood's consultant about remediation.

- Darling provided its independent auditor KPMG with a copy of the Agreement in 2001, which KPMG then used to verify that the terms of the Agreement were consistent with the "assets held for sale" designation on Darling's financial statements.  *See* Exs. B408-09 (KPMG documents).  ("Asset held for sale" is an accounting term applied to certain assets that meet the criteria set forth in Financial Accounting Standards Nos. 121 and 144.  *See* Ex. 523, at 3 (expert report of Mr. Essig).)  There was little reason for Darling to give KPMG a copy of the Agreement if the Agreement had actually terminated.

United States District Court

For the Northern District of California

1    •    In or about October 2000, Mr. McMurtry told Darling's environmental consultant, Chris

2         White of MFG, Inc., that Darling was in contract to sell the Property to Baywood.  *See* Tr. at

3         406 (testimony of Mr. White); B327 (notes of Mr. White, dated 10/11/00).

4         Likewise, Darling's internal communications indicate that Darling believed the 1990

5    Agreement had not in fact terminated.  Again, this corroborates Baywood's evidence that Darling's

6    conduct led Baywood to believe the 1990 Agreement remained in effect.

7    •    Soon after the alleged contract termination date, materials provided to Darling's board of

8         directors for a meeting in June 1997 stated that the status of the Property was "[s]ale for

9         $500,000 pending environmental agency approval."[5]  Ex. B388 (excess real estate status

10        report, dated 6/23/27).

11   •    Asset sales updates provided to the Darling board of directors in March and May 2000 (*i.e.*,

12        after Baywood delivered the second deposit) stated that the Property was "[u]nder contract

13        for sale since April 1990 for $500,000."  Ex. B391 (board materials, dated 3/29/00); Ex.

14        B392 (board materials, dated 5/17/00).  In addition, the May 2000 update specified that

15        "[c]urrently cleaning some debris from property and obtaining cost estimates for remaining

16        work required under 1990 contract."[6] *Id.*

17   •    In a document titled "Estimate on Property Reserves," dated August 2002, the Property was

18        characterized as "[c]urrently under contract for sale dated 1990."  Ex. B264 (estimated on

19        property reserves, dated 8/02).  The document also noted that "[s]ale agreement requires that

20        certain obligations be met with respect to the removal of all hazardous materials from the

21        site" and that "UST [underground storage tank] closure, Asbestos and lead paint removal,

22        debris removal, slude clean out, etc. (per current sale agreement) will cost $150,000."  *Id.*

23   _____

24        [5] Based on the evidence presented, it is not entirely clear who authored the excess real estate
     status report containing the above information.  However, given Mr. Phillips's responsibility over
25   Darling's real estate holdings and his specific responsibility for sale of the Property, it is a reasonable
     inference and the Court thus finds that (1) he authored the report, (2) he reviewed the report, or (3) he
26   provided the information regarding the Property to the author of the report.

27        [6] As above, it is not entirely clear who authored the assets sales updates, but given Mr. Phillips's
     responsibility over Darling's real estate holdings and his specific responsibility for sale of the Property,
28   it is a reasonable inference that (1) he authored the updates, (2) he reviewed the updates, or (3) he
     provided the information regarding the Property to the author of the updates.  The Court so finds.

United States District Court

For the Northern District of California

Mr. McMurtry, the author of the document, did not credibly explain away why he described the Property as currently under contract for sale, simply claiming that his choice of words "might be a poor label."  McMurtry Depo., vol. II, at 8.

• Darling's internal accounting documents -- in which the Property was characterized as an "asset held for sale" from December 2001 through June 2005, *see* Jt. Undisputed Facts at 3 -- specified that the Property was "Under Contract" and "Sold."[7]  *See, e.g.*, Exs. B440-42 (accounting documents).  *See, e.g.*, Exs. B358, 396 (assets held for sale).  As late as July 2004, internal accounting documents reflected that Mr. Weaver, in-house counsel, was working on an amended sales agreement rather than a new agreement.  *See* B358 (accounting documents).

To be sure, there were some internal communications within Darling which did suggest that Darling no longer believed the Agreement to be in full force and effect.  *See, e.g.*, Ex. B214 (memo, dated 1/26/04, from Mr. Phillips to Mr. Weaver) (noting that Mr. Wasem "was checking in on the status of our old contract" and that "Larry reminded me that about a year ago, he and I had talked about possibly Darling ginning up a draft of an amended contract that Darling would be amenable to signing to replace the old 1990 sales contract"); Exs. Ex. B208-09 (draft letters, dated 2/18/04, from Mr. Whiting to Mr. Wasem) (stating that the Agreement between the parties "has come to an end" and that  "the Agreement came to an end long ago").  However, these internal communications did not come about until 2004, *i.e.*, a very late stage in the dealings between Darling and Baywood.  Furthermore, even these internal communications were ambiguous as to Darling's intent regarding the Agreement.  For example, in Mr. Phillips's memo to Mr. Weaver, dated January 26, 2004, Mr. Phillips characterized the 1990 Agreement as an "old contract" but at the same time talked about amending the contract rather than negotiating a new one.  *See* Ex. B214.  In the draft letters composed by Mr. Whiting, Mr. Whiting asserted that the Agreement had terminated but ultimately the decision was made not to send either letter.  *See* Exs. B208-09.  Mr. Whiting did not send a letter

---

[7] The accounting documents were prepared by Darling's controller, which was, during the relevant period, initially Tim Gentry and later Brenda Snell.  Mr. Gentry relied on Mr. Phillips and Mr. McMurtry for information regarding the Property.  *See* Gentry Depo. at 71, 74; *see also id.* at 49-51.

1    explicitly stating that the Agreement had terminated until many months later on October 1, 2004.

2    *See* Ex. B206 (letter, dated 10/1/04, from Mr. Whiting to Mr. Wasem).

3       In sum, the Court finds that Darling waived its right to claim contract termination because its

4    conduct induced Baywood to reasonably believe that Darling had waived this right.  Darling's

5    conduct vis-a-vis third parties and Darling's internal communications corroborate the fact that

6    Darling believed, at least until late 2004, the Agreement remained in effect after May 31, 1997, and

7    behaved accordingly.

8   G.     <u>Estoppel</u>

9       In addition to waiver, the Court finds that Darling is equitably estopped from claiming

10   contract termination based on Baywood's untimely funding of the second deposit.

11      First, Darling was apprised of the relevant facts regarding the Property and its position vis-a-

12   vis Baywood.  It was, of course, aware of Mr. Mellina's letter of May 1, 1997, which demanded that

13   Baywood make the second deposit by May 31, 1997, and the fact that Baywood did not make the

14   deposit.  As discussed above, Darling was aware of its communications with Baywood including

15   those which occurred after the second deposit was made.  It was aware of Baywood's assertions in

16   its communications with Darling and of the conduct in which Baywood was engaged, including the

17   work on the state Lands Commission matters, indicating Baywood's belief the Agreement remained

18   in effect.

19      Second, as discussed above with respect to waiver, Darling's conduct vis-a-vis Baywood did

20   not convey that the Agreement had terminated on May 31, 1997.  Rather, Darling acted in such a

21   way as to induce Baywood to reasonably believe that the Agreement continued to be in effect

22   beyond this date until 2004.

23      Third, Baywood was ignorant of the true state of facts -- *i.e.*, it was not aware of Darling's

24   position that the Agreement had terminated on May 31, 1997.  Darling never took definitive action

25   or took a clear position.  That omission is particularly probative because a reasonable actor,

26   believing the contract had terminated, would expectedly have taken more definitive action.  As

27   noted above, Darling engaged in some ambiguous conduct such as refusing to sign the proposed

28   Amendments and affirm the Agreement, but the import of that conduct was at best ambiguous and

did not negate its other conduct which implied it believed the Agreement remained in effect.
Moreover, once Baywood delivered the second deposit on February 16, 2000, Darling's conduct
strongly implied it was treating the Agreement as valid.

Finally, Baywood relied upon Darling's conduct to Baywood's injury.  Most notably,
Baywood devoted significant resources to negotiating a title settlement agreement with the
California State Lands Commission.  In addition, Baywood incurred expenses in having its
environmental consultant, ph7 Environmental (formerly Real Environmental Assessments), prepare
environmental reports on the Property and in hiring architects and civil engineers to prepare
development plans for the Property.  *See, e.g.*, Tr. at 186 (testimony of Mr. Wasem); Ex. B513
(development plans, dated 4/18/00); Ex. B514 (development plans, dated 7/14/00).  Baywood
expended additional resources working with the City of Petaluma on both the City's draft
enhancement plan for the Petaluma River Marsh and its general plan amendment in order to avoid
negative impacts to the Property.  *See, e.g.*, Tr. at 186 (testimony of Mr. Wasem); Ex. 511 (letter,
dated 6/5/91, from Mr. Wasem to Ms. Rubin) (discussing draft enhancement plan); 529 (letter, dated
6/11/91, from Mr. Wasem to Ms. Rubin) (same); Ex. 528 (letter, dated 7/20/92, from Mr. Wasem to
Planning Commission) (same); Ex. B160 (letter, dated 4/21/04, from Mr. O'Brien to Ms. Tuft)
(addressing general plan for City of Petaluma); B516 (letter, dated 6/16/04, from Mr. Wasem to Ms.
Tuft) (same).  That Baywood's work on the title settlement agreement, the draft enhancement plan,
and the general plan amendment also benefitted its own property, and not just the Darling Property,
*see* Tr. at 225 (testimony of Mr. Wasem) is not dispositive.  There is no evidence that Baywood
would have undertaken the amount of work that it did on these matters, particularly with respect to
the title settlement agreement, in the absence of the 1990 Agreement.  The work on the title
settlement agreement primarily benefitted the Darling Property and, though the work was not done
at the specific behest of Darling (the Agreement placed the burden of clearing these title issues on
Baywood, *see* B26 (Agreement ¶ 5.1), the work was done with the knowledge and consent of
Darling.

///

///

-25-

**II.    CONCLUSIONS OF LAW**

A.    Darling's Claims for Cancellation of Instrument and Declaratory Relief

In its complaint, Darling asserts two causes of action: (1) cancellation of instrument, *see* Cal. Civ. Code § 3412, and (2) declaratory relief.  Darling asks that the Court cancel the Agreement and Memorandum of Agreement and issue a declaration that Baywood no longer has an interest in the Agreement or the Property.  According to Darling, the above relief is justified because the Agreement automatically terminated on May 31, 1997 (*i.e.*, per Mr. Mellina's letter of May 1, 1997).

1.    Contract Termination

Based on the findings of fact above, the Court concludes that the Agreement between Darling and Baywood for the purchase and sale of the Darling Property did terminate on May 31, 2007, because Baywood failed to fund the second deposit on that date.

2.    Waiver

However, based on the findings of fact above, Darling waived the right to assert contract termination based on Baywood's failure to make the second deposit in 1997.  "[W]aiver is the intentional relinquishment of a known right after knowledge of the facts."  *Waller v. Truck Ins. Exch.*, 11 Cal. 4th 1, 31 (1995) (internal quotation marks omitted).  "The burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does  not leave the matter to speculation, and 'doubtful cases will be decided against a waiver.'"  *City of Ukiah v. Fones*, 64 Cal. 2d 104, 107-08 (1966).  Baywood has established waiver by clear and convincing evidence.

"[A] waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right."  *Waller*, 11 Cal. 4th at 31.  There is a waiver when a "party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished."  *Id.* at 33-34.  Reasonable belief refers to the belief of the party asserting waiver.  *See, e.g., id.* at 34 ("Accordingly, plaintiffs have not shown that T.I.E.'s denial of a defense induced a reasonable belief *in plaintiffs* that T.I.E. intended to waive additional policy defenses.") (emphasis added); *Brookview Condominium Owners' Ass'n v. Heltzer*

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   *Enters.*, 218 Cal. App. 3d 502, 514 (1990) ("There was substantial evidence upon which the trial

2   court could have found that *appellant* was not misled, and did not hold any honest belief that Heltzer

3   Enterprises intended to waive its right to assert the untimeliness of service.") (emphasis added).[8]

4   Although the party asserting waiver must have a reasonable belief in order for there to be a waiver,

5   waiver does not require reliance by that party.  *See, e.g.*, *Waller*, 11 Cal. 4th at 33 ("[I]n the

6   insurance context the terms 'waiver' and 'estoppel' are sometimes used interchangeably, even

7   though estoppel requires proof of the insured's detrimental reliance."); *Brookview*, 218 Cal. App. 3d

8   at 512 ("Waiver refers to the act, or the consequences of the act, of one side only, while estoppel is

9   applicable where the conduct of one side has induced the other to take such a position that it would

10  be injured if the first should be permitted to repudiate its acts.").

11          It is not clear from the case law whether there can be an implied waiver if a party's conduct

12  with respect to a *third* party establishes intentional relinquishment of a known right but that conduct

13  is unbeknownst to (*i.e.*, not communicated to) the opposing party.  *See Sabo v. Fasano*, 154 Cal.

14  App. 3d 502, 508 & n.2 (1984) (not deciding if a waiver must be communicated to the other

15  contracting party to be effective; noting that rare case in which offeror's waiver not communicated

16  to offeree); *First Nat'l Mortg. Co. v. Federal Realty Investment Trust*, No. C-03-02013 RMW, 2006

17  U.S. Dist. LEXIS 57113, at *48 (N.D. Cal. Aug. 3, 2006) (concluding that a waiver must be

18  communicated to the other contracting party in order to be valid).  However, the Court need not

19  resolve this precise legal question[9] because, in the instant case, Darling's conduct, not

20  communicated to Baywood, is nonetheless considered by the Court as corroborative evidence that

21  Darling engaged in conduct which induced in Baywood a reasonable belief that Darling had waived

22  its right to contract termination.  *Cf. Oakland Raiders v. Oakland-Alameda County Coliseum*, 144

---

24  [8] *See also State Farm Fire & Casualty Co. v. Carter*, No. C-90-2823-DLJ, 1991 U.S. Dist.
    LEXIS 18168, at *21 (N.D. Cal. Dec. 16, 1991) ("In order for waiver to come into effect, State Farm

25  must have been aware of its rights and acted in such a manner as to induce a reasonable belief on the
    part of *Carter* that they were relinquishing their right to assert grounds for noncoverage under the other

26  policies.") (emphasis added); *cf. Medico-Dental Building Co. v. Los Angeles v. Horton & Converse*, 21
    Cal. 2d 411, 432 (1942) (noting danger that lessee could have waived lessor's breach of contract if

27  lessee paid rent to lessor)

28  [9] In its closing argument, Baywood conceded that waiver must involve some communication
    to the other side.  *See* Tr. at 1000.

1  Cal. App. 4th 1175, 1191 (2006) (giving no weight to the plaintiff's undisclosed subjective intent to

2  preserve (*i.e.*, not waive) its fraud claim because the plaintiff's claimed subjective intent was clearly

3  at odds with its conduct); *Utility Audit Co., Inc. v. City of Los Angeles*, 112 Cal. App. 4th 950, 959-

4  60 (2003) (discussing internal city communications as proof that the city did not intend to waive

5  because the city's internal mindset was not inconsistent with its actions).  As noted above, Darling's

6  conduct which was not communicated to Baywood -- either because communicated solely to a third

7  party or because communicated internally -- corroborates that Darling believed and conveyed to

8  Baywood its belief that the 1990 Agreement had not terminated.  Also, to the extent waiver requires

9  a subjective intent to relinquish a known right, this evidence together with the conduct discussed

10  above establishes this fact.

11      In concluding that Darling's conduct above was sufficient to induce in Baywood a

12  reasonable belief that Darling was waiving its right to claim contract termination based on untimely

13  delivery of the second deposit, the Court is mindful that a party's silence does not automatically

14  establish a waiver.  *See, e.g.*, *Greshko v. County of Los Angeles*, 194 Cal. App. 3d 822, 829-30

15  (1987) (refusing to "infer from respondents' silence that they waived or intentionally relinquished

16  their right to a judicial determination of good faith of their respective settlements, because the statute

17  does not set out any mandatory time limits within which a motion must be made").  In the instant

18  case, however, Darling engaged in a consistent pattern of silence and acquiescence that extended

19  over a period of seven years, even in the face of affirmative statements and action by Baywood.

20  *Compare Kay v. Kay*, 188 Cal. App. 2d 214, 218 (1961) (acknowledging that there was "a long lapse

21  of time between the first default and the declaration of default and demand for possession, but mere

22  lapse of time does not amount to a waiver").  Darling has not offered an adequate excuse for this

23  lengthy course of conduct especially when, as noted above, a reasonable actor believing the contract

24  had terminated, would have made its position clear.  Especially compelling is Darling's silence and

25  acquiescence in the face of Baywood's second deposit.

26  ///

27  ///

28  ///

United States District Court

For the Northern District of California

3.     Estoppel

In addition to waiver, the Court concludes that Darling is equitably estopped from asserting contract termination based on the untimely second deposit.  Under California law, the elements of equitable estoppel are:

> (1) the party to be estopped must be apprised of the facts; (2) [the party to be estopped] must intend that his conduct shall be relied upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the [party asserting estoppel] must be ignorant of the true state of facts; and (4) [the party asserting estoppel] must rely upon the conduct to his injury.

*Granite States Ins. Co. v. Smart Modular Techs.*, 76 F.3d 1023, 1028 (9th Cir. 1996).  The parties have agreed that the burden of proof with respect to estoppel is a preponderance of the evidence.

As the facts found above establish, Baywood has satisfied its burden in proving all four elements of equitable estoppel.  In concluding that Darling acted in such a way that Baywood had a right to believe the Agreement did not terminate on May 31, 1997, the Court notes that an estoppel may arise from silence.  *See Spray, Gould & Bowers v. Associated Internat'l Ins. Co.*, 71 Cal. App. 4th 1260, 1268 (1999).

> It is not necessary that the duty to speak should arise out of any agreement, or rest upon any legal obligation in the ordinary sense. Courts of equity apply in such cases the principles of natural justice, and whenever these require disclosure they raise the duty and bind the conscience and base upon the omission an equitable forfeiture to the extent necessary to the protection of the innocent party.

*Id.* (internal quotation marks omitted).  Again, the Court finds particularly compelling Darling's silence and acquiescence after Baywood made the second deposit.

4.     Implied-in-Fact Contract and Laches

Baywood contends that Darling cannot claim contract termination not only because of waiver and equitable estoppel but also because of the existence of an implied contract between the parties.  *See* Cal. Civ. Code § 1621 ("An implied contract is one, the existence and terms of which are manifested by conduct.").  The Court need not decide whether there was, as Baywood contends, an implied contract between the parties for the sale of the Property because it has already concluded that Darling waived its right to claim contract termination and is equitably estopped from asserting

1  such termination.  For the same reason, the Court need not decide whether, as Baywood asserts,

2  laches bars the relief sought by Darling.[10]

3  B.  Baywood's Claims for Breach of Contract/Specific Performance and Declaratory Relief

4  In its counterclaims, Baywood asserts two causes of action: (1) breach of contract/specific

5  performance[11] and (2) declaratory relief.  Baywood asks that the Court order Darling to comply with

6  the terms of the Agreement (*e.g.*, convey title to the Property to Baywood) and issue a declaration

7  that Darling is obligated to proceed with the terms of the Agreement (*e.g.*, transfer title to the

8  Property to Baywood) and that Darling waived the claim or is estopped from claiming that the

9  contract is not enforceable.

10  Darling does not attempt to rebut Baywood's contention that specific performance is the

11  proper remedy in the instant case because real property is involved.  *See* Cal. Civ. Code § 3387 ("It

12  is to be presumed that the breach of an agreement to transfer real property cannot be adequately

13  relieved by pecuniary compensation.").  Instead, Darling challenges the specific performance claim -

14  - and the declaratory relief claim -- by arguing that the statute of limitations is a bar, that Baywood

15  failed to tender the full purchase price, that the terms of the Agreement are too uncertain, and that

16  enforcement of the Agreement would require protracted supervision by the Court.

17  1.  Statute of Limitations

18  According to Darling, Baywood's claim for specific performance is barred by the statute of

19  limitations.  As noted above, *see* note 11, *supra*, specific performance is a remedy for breach of

20  contract.  Under state law, there is a four-year statute of limitations for breach of contract.  *See* Cal.

21  Code Civ. Proc. § 337 (imposing a four-year statute of limitations on actions "upon any contract").

22  "The general rule is that a cause of action for breach of contract accrues at the time of breach."

23  *Whorton v. Dillingham*, 202 Cal. App. 3d 447, 456 (1988); *see also* 3 Witkin Cal. Proc. Actions §

24
25  [10] The Court notes that laches does not likely apply inasmuch as Darling currently has possession and that the instant case is essentially a dispute over title and thus akin to a quiet title action.

26
27  [11] Baywood actually pled separate claims for breach of contract and specific performance.  But, as the Court noted in its order denying the parties' cross-motions for summary judgment, specific performance is actually "a *remedy* for breach of contract, a cause of action which requires proof the contract was breached."  *Golden West Baseball Co. v. City of Anaheim*, 25 Cal. App. 4th 11, 49 (1994) (emphasis in original).

28

459 ("The cause of action ordinarily accrues when, under the substantive law, the wrongful act is done and *the obligation or liability arises*, i.e., when a suit may be brought.") (emphasis in original).

According to Baywood, Darling breached the Agreement by refusing to sell the Property to Baywood in accordance with the Agreement.  Based on this breach, Darling contends that the statute of limitations began to run as of May 1, 1997, *i.e.*, the day that Mr. Mellina informed Mr. Wasem by letter that Darling had performed its remediation obligations under the Purchase Agreement and would not further extend the time for the property inspection.  In response, Baywood contends that its claim for breach of contract did not accrue until October 1, 2004, when Mr. Whiting sent his letter to Mr. Wasem, which stated that "Darling considers the 1990 [Purchase] Agreement to be terminated."  Ex. B206 (letter, dated 10/1/04, from Mr. Whiting to Mr. Wasem).

The Court agrees with Baywood that the claim for breach of contract did not accrue until October 1, 2004.  This was the first time that Darling plainly, expressly, and unequivocally stated that the Agreement had terminated.  As found above, there was no clear repudiation of the Agreement prior to this date; Darling's behavior was at best ambiguous and induced Baywood reasonably to believe that Darling considered the Agreement in effect until the Whiting letter of October 1, 2004.  This action was therefore timely filed.

2. <u>Tender</u>

Darling further argues that Baywood cannot demand specific performance because it has never actually tendered the full purchase price.  But, as Baywood argues, tender was excused once Darling repudiated the Agreement on October 1, 2004.  *See* Cal. Civ. Code § 1440 ("If a party to an obligation give notice to another, before the latter is in default, that he will not perform the same upon his part, and does not retract such notice before the time at which performance upon his part is due, such other party is entitled to enforce the obligation without previously performing or offering to perform any conditions upon his part in favor of the former party."); *Beverage v. Canton Placer Min. Co.*, 43 Cal. 2d 769, 777 (1955) ("[W]here a vendor repudiates a contract and indicates that he is not bound thereby, a tender is unnecessary. . . . [A] formal tender of performance is excused by the refusal in advance of the party to accept the performance owing.").

United States District Court
For the Northern District of California

1    That being said, the Court acknowledges that specific performance by Darling should not be

2 ordered unless Baywood ultimately pays the full purchase price under the Agreement.  In other

3 words, Baywood is entitled to at most a conditional decree of specific performance.  *See* Cal. Civ.

4 Code § 3386(b) (noting that specific performance may be compelled if the agreed

5 counterperformance has been substantially performed or its concurrent or future performance is

6 assured or, if the court deems necessary, can be secured to the satisfaction of the court); *id.*, 1969

7 law revision comment (noting that "the assurance or security that the defendant will receive the

8 agreed counterperformance may be provided by the plaintiff's past conduct, by his economic interest

9 in performing, or by granting a conditional decree or requiring the plaintiff to give security for his

10 performance"); *see also Behniwal v. Mix*, 133 Cal. App. 4th 1027, 1045 (2005) (noting that "the

11 ability-to-perform problem is ultimately self-correcting" because, "[i]f the trial court orders specific

12 performance, it is hardly going to hold the Mixes, as sellers, in contempt for not selling to the

13 Behniwals if the Behniwals ultimately can't come up with the money").

14    A conditional decree of specific performance can resolve not only the matter of Baywood's

15 tender of the full purchase price but also any other issues regarding performance by Baywood under

16 the terms of the Agreement (*i.e.*, performance by Baywood prior to or concurrent with the actual

17 transfer of the Property to Baywood).

18    3.    Certainty and Court Supervision

19    Darling also argues that specific performance is not warranted or, if awarded, should be

20 limited to transfer of title to the Property "as is" because the terms of the Agreement are not

21 sufficiently certain, *see* Cal. Civ. Code § 3390(5) (providing that the following cannot be

22 specifically enforced: "[a]n agreement, the terms of which are not sufficiently certain to make the

23 precise act which is to be done clearly ascertainable"), and because the Court would otherwise be

24 required to engage in protracted supervision of the parties' performance of the Agreement.  Neither

25 argument is persuasive.

26    a.    Certainty

27    "In order for a court of equity to decree that an obligation is specifically enforceable the

28 terms of the contract must be complete and certain in all particulars essential to its enforcement.

United States District Court

For the Northern District of California

The agreement must not only contain all the material terms but also express each in a reasonably definite manner." *Lawrence v. Shutt*, 269 Cal. App. 2d 749, 761 (1969). In the instant case, Darling asserts that the terms of the Agreement dealing with remediation (which undisputedly are material terms) are not sufficiently certain. The sole basis of Darling's contention is that the parties dispute the scope of Darling's remediation obligations. However, a party cannot prevent specific performance of a contract merely by pointing to a dispute over contract interpretation.[12] *Cf. Okun v. Morton*, 203 Cal. App. 3d 805, 817 (1988) ("At bottom, [if] the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left.") (internal quotation marks omitted). That a dispute over contract interpretation exists does not necessarily imply the contract is not "reasonably definite."

The question is whether the material terms are expressed in a reasonably definite manner. In the instant case, the parties defined remediation obligations and completion of remediation in the Agreement. *Compare Lindsay v. Lewandowski*, 139 Cal. App. 4th 1618, 1623 (2006) (noting that parties had signed a stipulation for settlement providing that a dispute as to the terms of the settlement would be resolved through "binding mediation"; stating that "[w]e cannot tell what the parties meant when they provided for 'binding mediation'"). The parties provided specific and detailed definitions, and their dispute over remediation pertains only to scope. That scope issue is fairly easily resolved. *See* Part II.B.4, *infra* (addressing remediation obligations and completion of remediation). The uncertainty regarding remediation is minimal.

> b.   <u>Court Supervision</u>

"An archaic doctrine denies specific performance of contracts that call for a series of acts requiring continuous supervision, such as agreements for construction and repair." 13 Witkin Sum. Cal. Law Equity § 45; *see also Okun*, 203 Cal. App. 3d at 821 (1988) (noting that the application of

---

[12] *See* 13 Witkin Sum. Cal. Law Equity § 42 (noting that "[c]ourts sometimes say that more certainty is required in a suit for specific performance than in an action for damages" but that "this rule is of doubtful practical significance, for in the large majority of California cases in which the rule is invoked, the contract was also too uncertain to support an action for damages").

United States District Court

For the Northern District of California

the doctrine "generally is limited to building construction contracts and distribution or sales agency agreements"). While "[t]he earlier California cases followed this rule . . . [,] application of the doctrine was not always consistent." 13 Witkin Sum. Cal. Law Equity § 45. Furthermore, "[t]he better modern cases and other authorities reject this doctrine and give specific performance whenever it is practically feasible." *Id. See, e.g.*, *Ellison v. Ventura Port Dist.*, 80 Cal. App. 3d 574, 581 (1978) (concluding that a contract provision for periodic dredging of a channel was specifically enforceable; specifically stating that "the doctrine is an archaic one and should not be unduly extended"); *Okun*, 203 Cal. App. 3d at 821 (rejecting argument that enforcement of the contract would require "inordinate [court] supervision" because the future venture did not involve day-to-day management activities).

Here, ordering remediation by Darling will not require protracted supervision by the Court. For the reasons discussed below, remediation by Darling is largely complete. "Compared to the complexity of the acts required in contracts for development or operation of railroads, mines, oil fields, or even citrus groves, the [limited remediation in the instant case] pales to insignificance and should place no great burden on the [C]ourt to supervise." *Ellison*, 80 Cal. App. 3d at 581. In addition, in contrast to exclusive distribution or sales agency contracts, little cooperation between the parties is required to fulfill Darling's obligation to remediate. *See id.*

4.      Remediation

Having rejected Darling's challenges to the specific performance claim, the Court now turns to the issue of what Darling must specifically perform. As noted above, ultimately Darling must transfer the Property to Baywood in accordance with the Agreement, subject to Baywood's counterperformance required by the Agreement (*e.g.*, tender of the full purchase price). However, Darling also has the obligation to remediate the Property, either prior to or after closing as provided for by the Agreement. *See* Ex. B26 (Agreement ¶ 4.1).

a.      Darling's Remediation Obligations

The Court rejects Baywood's contention that Darling's remediation obligations are defined per se by the General Report. Under the Agreement, the General Report is simply the results of the Phase 1 and Phase 2, if any, environmental investigation. *See id.* (Agreement ¶ 4.4.2). The

-34-

1  Agreement does not require Darling remediate everything identified in the General Report.  Rather,

2  the Agreement provides that Darling submit the General Report (or a written summary, disclosure,

3  work plan, or other notice) to the appropriate governmental agencies.  *See id.* (Agreement ¶ 4.4.3).

4  Darling's remediation obligation turns on what the agencies require in response thereto and is

5  further limited by the terms of the Agreement.  As discussed below, Darling's obligations are limited

6  to Hazardous Materials in the soil or below the surface.  *See id.* (Agreement ¶¶ 4.1, 4.5).  Moreover,

7  Darling's obligations to remediate are deemed complete when the applicable governmental agencies

8  have approved of the remediation work or when Darling completes the remediation work plan

9  approved by the agencies as discussed below.  *See id.* (Agreement ¶ 4.7).  Hence, Darling's

10  obligations are defined by the public agencies in response to the General Report, not the General

11  Report itself.

12       The Court also rejects Darling's contention that the Agreement is ambiguous as to the scope

13  of Darling's remediation obligations.  Darling is correct that both ¶ 4.1 and ¶ 4.5 of the Agreement

14  address remediation work to be done by Darling.  Paragraph 4.1 of the Agreement, titled "Seller's

15  Remediation Obligation," provides that it is Darling's obligation

16          to remove all underground tanks (the "Tanks") that may be situated on
        the Subject Property in the manner required by law and to remove,

17          contain and/or remediation all Hazardous Materials in the soils,
        surface water and groundwater at, on, in, under or about the Subject

18          Property, including, without limitation, all asbestos and waste products
        from underground cisterns.

19

20  *Id.* (Agreement ¶ 4.1).

21       Paragraph 4.5 of the Agreement, titled "Remediation Work," provides that it is Darling's

22  obligation

23          to take all actions to remediate, contain, treat or remove all Hazardous
        Materials from the soils, surface water and ground water located at,

24          on, in, under or about the Subject Property in strict compliance with
        governmental permits, approvals, orders and directions and in

25          accordance with applicable law (the "Remediation Work").

26  *Id.* (Agreement ¶ 4.5).

27       Darling is also correct that ¶ 4.1 explicitly refers to removal of asbestos and waste products

28  from underground cisterns, while ¶ 4.5 does not.  But, contrary to what Darling asserts, this

United States District Court

For the Northern District of California

1  difference does not create an inconsistency.  Paragraph 4.1 simply clarifies that the remediation of

2  the soils, surface water, and ground water -- also required under ¶ 4.5 -- *includes* remediation of

3  asbestos and waste products from underground cisterns.

4         Darling is not required, as suggested by Baywood, to remediate any asbestos above ground.

5  Although asbestos is defined as a hazardous material in ¶ 4.2 of the Agreement, Darling's

6  remediation obligations are defined by ¶¶ 4.1 and 4.5, not ¶ 4.2.  Paragraph 4.1 plainly provides that

7  only asbestos in the soils is to be remediated, not asbestos in the structures above ground.  *See id.*

8  (Agreement ¶ 4.1) (providing for "remediation all Hazardous Materials in the soils, surface water

9  and groundwater at, on, in, under or about the Subject Property, including, without limitation, all

10 asbestos and waste products from underground cisterns").

11        As to what constitutes an underground cistern, an issue disputed at trial, Darling contends

12 that the term applies only to the underground enclosed storage tanks which have not yet been

13 evaluated (*i.e.*, those tanks that cannot be accessed until the Property is demolished).  In contrast,

14 Baywood asserts that the term also applies to the clarifiers (*i.e.*, the open pits in the ground used in

15 the clarification process).  The Court agrees with Baywood.  Dwight R. Hoenig, Baywood's expert

16 testified that, though the term "cistern" is "out of use these days," it "is typically or often considered

17 being open containment for holding water."  Tr. at 450 (testimony of Mr. Hoenig).  Darling did not

18 present any evidence to the contrary.  It has not, for instance, presented any accepted definitions of

19 "cistern" which requires the tank be enclosed.  *See e.g.* http://www.m-w.com/dictionary/cistern (last

20 visited on 7/9/07) (defining "cistern" as an artificial reservoir (as an underground tank) for storing

21 liquids and especially water (as rainwater)"); American Heritage Dictionary (3d ed. 1992) (defining

22 "cistern" as "[a] receptacle for holding water or other liquid, especially for tank for catching and

23 storing rainwater").

24              b.      Completion of Remediation

25        The Court now turns to the issue of whether or not Darling has completed its remediation

26 obligations.  As Darling notes, there are two paragraphs that discuss completion.  Paragraph 4.7 of

27 the Agreement, titled "Definition of Completion," provides that,

28

[f]or purposes of this Agreement, the Remediation Work shall be deemed complete only after (i) the Remediation Work has been accepted and approved by the Supervising Consultant and all Public Agencies as having been completed to a level below action levels for commercial and industrial use and development *or* as having been completed in the manner required by the remediation work plan approved by the Public Agencies; and (ii) the Supervising Consultant and any and all other consultants and contractors employed in the Remediation Work have been paid in full and have executed unconditional final releases of lien or sixty (60) calendar days have elapsed since the recordation of a Notice of Completion without filing of a mechanics lien claim, whichever date occurs latest.  For purposes of this Paragraph 4.7, the Remediation Work shall be deemed to be complete even if Purchaser must maintain monitoring wells after the completion and acceptance of the balance of the Remediation Work.

*Id.* (Agreement ¶ 4.7) (emphasis added).

Paragraph 4.1 of the Agreement is titled "Seller's Remediation Obligation" and specifies that

Seller shall be deemed to have removed, contained and/or remediated Hazardous Materials situated at, on, in, under or about the Subject Property if the levels of Hazardous Materials in the soil, surface water and ground water comply with all regulations, guidelines, standard and other criteria for commercial and industrial use and development of the Subject Property as established by applicable local, regional, state or federal agencies asserting jurisdiction over the Subject Property, or any part thereof, as of the later of the Closing Date or the Date that Seller completes the work in the manner described in Paragraph 4.8 below.

*Id.* (Agreement ¶ 4.1).

As Darling points out, while ¶ 4.1 discusses completion only in terms of cleanup to industrial use levels, ¶ 4.7 allows cleanup to such levels *or* pursuant to an approved remediation work plan. This difference does not, however, does not create an inconsistency.  Paragraph 4.1 simply states that Darling may be deemed to be remediated if cleanup is to commercial and industrial use levels. It does not preclude completion of remediation under another standard (*i.e.*, the other standard provided for in ¶ 4.7).  Paragraph 4.7 is more specific and is not preempted or obviated by ¶ 4.1. Therefore, Darling will have completed its remediation obligations if it achieves cleanup to commercial and industrial use levels or in the manner required by an approved remediation work plan pursuant to ¶ 4.7.

1

c.     Outstanding Remediation

2       The Court finds that Darling's remediation obligations were completed within the terms of ¶

3 4.7 as of March 11, 1997, when Sonoma County's Department of Health Services sent the letter to

4 Darling which stated that,

5               [b]ased on the information submitted to this office and the San
               Francisco Regional Water Quality Control Board, no further remedial
6               action will be needed at this site if after two years of semi-annual
               monitoring there is no evidence of adverse pollutant migration.  At the
7               end of the two year monitoring period, the site will be evaluated for
               closure.

8

9 Ex. B186 (letter, dated 3/11/97, from Ms. Allen to Mr. McMurtry); *see also* Jt. Undisputed Facts at

10 2.  Under ¶ 4.7 of the Agreement, Darling had remediated the Property pursuant to an approved

11 remediation work plan by the relevant public agencies.

12       Baywood does not dispute that the relevant public agencies are the Sonoma County

13 Department of Health Services and the Regional Water Quality Control Board, *see, e.g.*, Tr. at 429-

14 31 (testimony of Mr. Hoenig); *id.* at 784 (testimony of Mr. Clark), nor does it contend that approval

15 of a work plan by any other public agency was pending.  Rather, it challenges the letter from the

16 Department of Health Services as not constituting the requisite approval on two grounds.

17       First, Baywood asserts that the letter addressed only groundwater and not soils.  This

18 argument is not convincing as Baywood's own remediation witnesses testified to the contrary.  *See,*

19 *e.g., id.* at 431 (testimony of Mr. Hoenig); *id.* at 883-85, 892-97 (testimony of Mr. Clark).  The

20 evidence at trial established that it is highly unlikely that these agencies would not have intended to

21 address both; that would have been contrary to their usual practice.  *See, e.g., id.* at 896-97

22 (testimony of Mr. Clark).

23       Second, Baywood argues that there was no completion of remediation since the letter

24 required that there be monitoring of the Property.  However, ¶ 4.7 of the Agreement specifically

25 provides that "the Remediation Work shall be deemed to be complete *even if* Purchaser must

26 maintain monitoring wells after the completion and acceptance of the balance of the Remediation

27 Work."  B26 (Agreement ¶ 4.7) (emphasis added).  Even Mr. Wasem admitted this fact in his letter

28

-38-

of May 1, 1997, in which he responded to Mr. Mellina's claim that remediation had been completed. *See* Ex. B287 (letter, dated 5/1/97, from Mr. Wasem to Mr. Mellina).

Baywood further argues that Darling could have not completed its remediation obligations until, in accordance with ¶ 4.7, the Supervising Consultant gave its approval. *See* Ex. B26 (Agreement ¶ 4.7) ("[T]he Remediation Work shall be deemed complete only after (i) the Remediation Work has been accepted and approved by the Supervising Consultant and the Public Agencies . . . as having been completed in the manner required by the remediation work plan approved by the Public Agencies."). No Supervising Consultant was ever clearly designated by the parties. Baywood, however, waived its right to enforce this provision of the Agreement. Notably, in response to Mr. Mellina's May 1, 1997, letter, Mr. Wasem never contested that remediation was not complete because of a lack of approval by the Supervising Consultant. Both Darling and Baywood had a role in appointing the Consultant under ¶ 4.4.2. Yet Baywood, obviously knowledgeable of this provision in the Agreement, took no steps to facilitate, encourage, or demand the appointment. Rather, despite the active involvement of Mr. Wasem in seeking and negotiating Darling's performance of the Agreement, Mr. Wasem never said a word about the failure to appoint a Supervising Consultant. Darling was not informed that this mattered to Baywood. The Court finds that Baywood waived its right to insist that such a Consultant be appointed and thus waived the requirement that the remediation work be approved by such Consultant.

Accordingly, the Court concludes that Darling's remediation obligations were complete as of March 11, 1997, under ¶ 4.7 of the Agreement. The parties could have proceeded to close escrow pending satisfaction of other conditions unrelated to remediation. However, the transaction did not proceed to close of escrow for reasons discussed herein, in large part due to Baywood's posture and actions.[13]

After the March 11, 1997, letter from the Sonoma County Department of Health Services, the Department determined that additional remediation was required. In a letter dated April 20,

---

[13] Although Baywood now claims that there were other conditions to close of escrow which had not been satisfied by Darling, such as those relating to the exceptions, Baywood did not pursue these issues after the March 11, 1997, Department of Health Services letter and expressed little interest in getting Darling to resolve these collateral issues.

United States District Court

For the Northern District of California

2000, the Department informed Darling that it was requesting "further discussion and evaluation on this site due to potential fire hazard and possible construction worker exposure to Benzene." Ex. B193 (letter, dated 4/20/00, from J. Tracy to S. Rao). Because of this letter and with escrow still open, Darling's remediation obligation could no longer be deemed completed under ¶ 4.7: The remediation work could no longer be deemed "as having been completed in the manner required by the remediation work plan approved by the Public Agencies." In fact, Darling then undertook to perform substantial remediation work over the course of the lengthy escrow.

Closure of the remediation work has now been obtained under ¶ 4.7. *See* Ex. 187 (letter, dated 7/24/02, from Mr. Radford to Mr. Jang) (stating that "it does not appear that further monitoring, investigation or remedial actions are necessary at this site to protect the beneficial uses of the waters of the State of California"); Ex. 189 (letter, dated 7/30/04, from Mr. Krug to Mr. McMurtry) (stating that the site investigation and corrective action carried out at Darling's underground storage tank(s) site was in compliance with the law and "no further action related to the petroleum release(s) at the site is required"). Nonetheless, Darling has agreed to assume the remediation of the underground, enclosed storage tanks that have not yet been evaluated.[14] As to the clarifiers (*i.e.*, the open pits in the ground used in the clarification process) Darling's only objection to remediating those is Darling's assertion the clarifiers are not "cisterns" within the meaning of ¶ 4.1. But as the Court finds herein, these clarifiers are "cisterns," and thus Darling must remediate those as well.[15]

    5.    <u>Environmental Indemnification</u>

Baywood has asked for enforcement of all terms of the Agreement including Darling's environmental indemnification obligation. *See Iverson v. Goodbub*, 128 Cal. App. 538, 540 (1933) ("It is the policy of equity that it once having acquired jurisdiction it will settle all the

---

[14] Darling admits that it has this remediation obligation. *See* Tr. at 941 (closing argument).

[15] As discussed below, these remediation obligations may well fall within the indemnification provisions of the Agreement even if closure were obtained from agencies under ¶ 4.7 prior to close of escrow. However, with the exception of these two remediation obligations which Darling must undertake, the Court, for equitable reasons discussed below, refuses to enforce the indemnification clause.

United States District Court

For the Northern District of California

1   controversies between the parties that it can reasonably do, so as to avoid unnecessary litigation.").

2   However, as noted by one state court, a court of equity is not "required to enforce [a] contract

3   completely, or not at all." *Ellison*, 80 Cal. App. 3d at 583.  Rather, "[w]here it is possible to bring

4   about substantial justice by adjusting the equities between the parties, a court of equity can grant

5   relief." *Id.*; *see also Hershey v. Los Angeles Pacific Co.*, 171 Cal. 353, 355(1915) (noting that "the

6   granting or withholding of specific performance is within the discretion of a chancellor and that

7   specific performance will be decreed only under equitable circumstances, quite regardless of the

8   express terms of a contract"); *Bank of America Nat'l Trust & Sav. Ass'n v. Moore*, 18 Cal. App. 2d

9   522, 529 (1937) ("It may be . . . that the nature of the repairs required in this case will lead the trial

10  court to the conclusion that a court should not undertake the task of ordering them done . . . or that

11  for other reasons the equitable relief sought should not be furnished."); Rest. (2d) Contracts § 358

12  ("An order of specific performance or an injunction will be so drawn as best to effectuate the

13  purposes for which the contract was made and on such terms as justice requires.  It need not be

14  absolute in form and the performance that it requires need not be identical with that due under the

15  contract.").

16      The Court concludes Baywood is not entitled to the equitable remedy of specific

17  performance of the environmental indemnification provision.  *See* Ex. B26 (Agreement ¶ 4.9).

18  There are strong equitable reasons why the indemnification provision should not be enforced against

19  Darling.  Although Darling's conduct with respect to Baywood has been less than exemplary --

20  having engaged in conduct that constitutes waiver and estoppel -- Baywood's conduct with respect

21  to Darling has also been less than exemplary.

22      First, throughout their dealings, Baywood repeatedly insisted that Darling had remediation

23  obligations beyond that which were required by the Agreement and demanded that Darling perform

24  up to those standards even though not supported by the Agreement.  For example, as early as May

25  1990 (*i.e.*, soon after the Agreement was executed), Baywood claimed that "*any* asbestos located on

26  the Property must be removed and is considered to be part of the Remediation Work," Ex. B256

27  (letter, dated 5/15/90, from Mr. Wasem to Mr. Farrell) (emphasis added), but, as the Court has found

28  above, the Agreement only requires remediation of asbestos at or below ground.  *See* Ex. B26

United States District Court

For the Northern District of California

1    (Agreement ¶ 4.1).  Only a month later, Baywood claimed that "the recommendations of the General

2    Report are a part of the Remediation Work," Ex. B500 (letter, dated 6/13/90, from Mr. Wasem to

3    Mr. Farrell), even though, as discussed above, the Agreement only provides that the General Report

4    (or a written summary, disclosure, work plan, or other notice) be provided to the appropriate

5    governmental agencies, and the scope of remediation is determined by the agencies.  *See* Ex. B26

6    (Agreement ¶¶ 4.4.3 and 4.7).  Baywood continued to assert these claims throughout its dealings

7    with Darling, *see, e.g.*, Ex. B260 (letter, dated 8/22/05, from Mr. Frassetto to Mr. Whiting) (claiming

8    that the General Report defined the remediation work to be done by Darling), and persisted in

9    making these claims within the instant litigation.

10          Second, Baywood continually insisted that the remediation was not complete until there was

11   formal closure by the public agencies.  This assertion flies in the face of clear language of ¶ 4.7 of

12   the Agreement.  *See, e.g.*, Ex. B287 (letter, dated 5/1/97, from Mr. Wasem to Mr. Mellina) ("While I

13   agree that the Agreement is clear that the mere existence and maintenance of the monitoring wells

14   does not effect the definition of 'completion,' I believe it was contemplated that formal closure

15   would occur prior to Closing.").  Baywood never abandoned this assertion in its dealings with

16   Darling, even through the instant litigation.

17          Baywood's conduct in insisting on performance not required by the contract verged on

18   breach of the Agreement.  *Cf.* 23 Williston on Contracts §§ 63:47-63:48 (noting that a party

19   "commits an anticipatory breach by making an express demand for a performance to which he or she

20   is not entitled, as by, for example, a statement that the party will not perform except on conditions

21   that go beyond the contract, or on terms different from the original contract"; also stating that "it is

22   an anticipatory breach to . . . insist that [a contract's] meaning or legal effect are different in a

23   material particular from the true meaning or effect, coupled with the assertion, express or implied in

24   fact, that performance will be made only according to the erroneous interpretation").

25          Furthermore, until it made the second deposit in February, 2000, Baywood had insisted that

26   Darling complete its remedial obligations as a condition to Baywood's second deposit.  The

27   Agreement did not so provide.  As discussed above, the second deposit under ¶ 2.2 of the Agreement

28   was not conditioned on completion of the remediation work under ¶¶ 4.1 or 4.5.  Moreover, as

United States District Court

For the Northern District of California

1   discussed above, Darling had in fact completed the requisite remediation work pursuant to ¶ 4.7 as

2   of the Sonoma County Department of Health Services letter of March 11, 1997.  Baywood's refusal

3   to make the second deposit and defer steps to complete closing were motivated in party by its desire

4   to obtain resolution of the State Land Commission title dispute even though Darling was not

5   required to remove such claims on title under ¶ 5.1 of the Agreement.

6       Baywood benefitted from this delay in making the second deposit and in tendering

7   performance to close escrow.  It was able to minimize significant environmental and title risks prior

8   to making the second deposit and close of escrow.  As a result of the further action required by the

9   County (after the March 11, 1997, letter) which ensued after Baywood's delay, Darling incurred

10  substantial expenditures in completing additional remediation work.  Indeed, Darling remediated the

11  site to residential standards, exceeding the commercial standards set forth in the Agreement.  *See* Tr.

12  at 408 (testimony of Mr. White) (stating that the Property was cleaned up "to a residential cleanup

13  standard"); Ex. 140 (soil remediation report, dated 10/31/02); *see also* Tr. at 440 (testimony of Mr.

14  Hoenig).[16]  As ordered herein, the Court is also requiring Darling to remediate the storage tanks and

15  clarifiers.  Baywood has thus obtained greater assurance regarding remediation than it was entitled

16  to under the Agreement prior to risking the second deposit and prior to tendering its performance to

17  close escrow.  Furthermore, the delay enabled Baywood to minimize its title risk by obtaining an

18  agreement in principle with the State Lands Commission prior to close of escrow.

19      Moreover, Baywood retained the use of the second deposit and purchase money during the

20  several year delay.  Given the length of the delay, the difference in time value of money is

21  significant.  Darling, on the other hand, suffered the correlative costs and losses resulting from the

22  delay.  As found above, Baywood, though not entirely responsible, contributed substantially to the

23

24      [16] To be sure, had the escrow closed in 1997 and subsequent remediation was then ordered by
    the authorities after close of escrow, Darling may have been responsible under the indemnification
25  clause of the Agreement to attain commercial level remediation.  But in this case Baywood is obtaining
    the benefit of certainty as to remediation prior to close of escrow.  That certainty prior to close of escrow
26  is a benefit since it removes any uncertainty as to the applicability and scope of the indemnification (*see,
    e.g.,* ¶ 4.9.4, burden of proving causation is on purchaser) and the timing of the remediation (under ¶
27  4.5.3 had a postponement notice been given where purchaser does not assume the costs over $200,000,
    seller to have up to 59 years to complete remediation and under ¶ 4.9.5 seller is relieved of
28  indemnification if purchaser requests remediation clause under ¶ 4.8.5 which implements ¶ 4.5.3).

delay by refusing timely to make the second deposit and insisting on limiting its risk on remediation and title before moving forward towards close of escrow.

Accordingly, the Court concludes in the exercise of equity that while Baywood is entitled to specific performance mandating *inter alia* that title to the Property be transferred upon tender of full consideration, Baywood is not entitled to specific performance of the indemnification provision.

C.     Summary

Based on the foregoing, the Court finds against Darling on its claims for cancellation and declaratory relief and in favor of Baywood on its claims for specific performance and declaratory relief.  Baywood is entitled to a conditional decree of specific performance of the Agreement, except for the environmental indemnification provision.

IT IS SO ORDERED.

Dated:  July 13, 2007

_____
EDWARD M. CHEN
United States Magistrate Judge